# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 16-68 |
| ) | Judge Nora Barry Fischer |
| ANDRAE PRIDE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

**I.  Introduction**

Presently before the Court is an Amended Motion to Suppress Evidence (Docket No. 192) filed by Defendant Andrae Pride ("Defendant"). The Government filed its Response in opposition thereto, and the Court held a motion hearing on March 5 and 18, 2019, the official transcript of which has been filed of record and considered by the Court. (Docket Nos. 196, 202, 203). At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of law, (Docket Nos. 204, 207), but did not file responses thereto by the established deadline of June 3, 2019. (Docket No. 201). After careful consideration of all of the parties' submissions and the credible evidence of record, and for the following reasons, Defendant's Amended Motion to Suppress is denied.

**II.  Background**

  **A.  Procedural History**

On March 29, 2016, Defendant was charged in a three-count Indictment with the following: possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); possession with intent to distribute a quantity of heroin in violation of 21 U.S.C. §§

1

841(a)(1) and 841(b)(1)(C); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), all for conduct occurring on or about March 17, 2016. (Docket No. 1).

Attorney Melvin Vatz, who was Defendant's second court-appointed counsel, filed numerous pretrial motions on his behalf, including two suppression motions. (Docket Nos. 87-94, 126-128). Following a hearing and additional briefing, the Court denied Defendant's suppression motions, ruled on the other pretrial motions and scheduled trial to begin on October 10, 2018. (Docket Nos. 84, 85, 103, 105, 114, 116, 117, 139, 144, 159). At Defendant's request, the trial was rescheduled on December 3, 2018. (Docket Nos. 149, 153, 156).

In October 2018, the Court received correspondence from Defendant, which was forwarded to Attorney Vatz, who then filed a motion to withdraw as counsel. (Docket No. 162). Following a status conference held on October 25, 2018, the Court granted Attorney Vatz's motion to withdraw. (Docket Nos. 163, 166). Attorney William McCabe, who is Defendant's current counsel, was appointed to represent him on October 30, 2018. (Docket No 167).

After Attorney McCabe's appointment, the Court held several status conferences to get the case back on track and reschedule a trial date. (Docket Nos. 170, 175, 183, 188). At the conference held on January 15, 2019, Defendant expressed his intent to file an amended motion to suppress to which Government counsel objected. (Docket No. 183). The Court granted Defendant's oral motion for extension of time to file pretrial motions and ordered that the amended suppression motion must be filed by February 15, 2019. (Docket No. 185). As stated, the Court held oral argument on Defendant's motion and all supplemental briefing is complete, thus the matter is ripe for disposition.

**B. Facts**[1]

As discussed in more detail below, at issue here is whether Defendant was given *Miranda* warnings before he made statements in response to questioning by law enforcement.[2] At the hearing, the Government called City of Pittsburgh Bureau of Police Detectives Matthew Lebedda and Victor R. DiSanti, Jr., who testified that Defendant was provided with *Miranda* warnings and waived his *Miranda* rights. The Government also entered into evidence the *Miranda* warning card carried by Detective Lebedda and used by Detective DiSanti. (Docket No. 200-7). Defendant cross-examined those witnesses and also called Parole Agent Martin Vojacek and entered into evidence a number of exhibits. (Docket Nos. 200-2, 200-3, 200-4, 200-5, 200-6, 201-2, 201-3). In this Court's estimation, based on their demeanor and testimony in response to the questioning of the attorneys and the Court at the suppression hearing, Detectives Lebedda and DiSanti and Agent Vojacek offered credible testimony concerning their versions of the events that unfolded on the date in question, despite the defense's efforts to impeach them. *See United States v. Garcia,* 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'"). In addition, both Detectives Lebedda and DiSanti and Agent Vojacek presented as experienced officers. In that regard, Detective Lebedda testified that he has been employed as a

---

1     At a hearing on a motion to suppress, it is well-settled that "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).

2     At the suppression hearing, Government counsel stated, "we clarified that the defense is not seeking to suppress the statements on the basis of the fact that [Defendant] didn't understand any questions that may have been read to him, but the only inquiry is whether he was read them at all." (Docket No. 202 at 14). Defendant's counsel did not object to this clarification of the issue.

Pittsburgh Police officer for 25 years, including 15 years as a detective, Detective DiSanti previously testified that he has 21 years of law enforcement experience, including 17 years with the City of Pittsburgh, and Agent Vojacek previously testified that he has 19 years of experience in law enforcement, serving the past 12 years with the Board of Probation and Parole. (Docket Nos. 111 at 7-8, 88-89; 202 at 4).

By way of background and as set forth in the Court's prior suppression opinion, Agent Vojacek was assigned to supervise Defendant, who was on state parole. (Docket No. 116 at 3). Defendant was authorized to reside at an apartment on Mt. Vernon Road in the Homewood section of the City of Pittsburgh with his then-girlfriend, Sherelle Clausell.[3] (*Id.*). In March 2016, Agent Vojacek received information from ATF Agent Neil Carman that Clausell had purchased ballistic vests, gas masks and three firearms at the Big Butler Gun Show and that Defendant and another individual were with her and had been observed handling firearms at the gun show. (*Id.* at 5). Agent Vojacek and ATF Agent Carman believed that the types of firearms purchased by Clausell were not commonly utilized by women of her stature. (*Id.*). In view of Defendant's criminal history and relationship to Clausell, Agent Vojacek felt that Clausell had purchased the firearms for Defendant and believed that he had reasonable suspicion to search Defendant's residence.[4] (*Id.* at 6). Agent Vojacek sought and obtained approval from his supervisors to conduct a search and arranged to meet with Defendant at the apartment on March 17, 2016. (*Id.*). A pat down search of Defendant uncovered more than $2,400 and a cell phone.

---

3      On December 22, 2017, Clausell pled guilty in Criminal No. 16-207 to conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, and conspiracy to commit witness tampering, in violation of 18 U.S.C. § 1512(k). (Docket No. 56). On October 25, 2018, the Court sentenced Clausell to concurrent terms of three years' probation. (Docket No. 79).

4      The Court previously ruled that the Government met its burden to demonstrate that Agent Vojacek had reasonable suspicion to conduct the warrantless search of Defendant's residence. (Docket No. 116 at 15).

(*Id.*). During Agent Vojacek's search of the two-room apartment, he observed an open gun safe in the bedroom which contained a firearm and a bag of suspected heroin. (*Id.* at 7). At that point, Agent Vojacek stopped his parole search and contacted Detective DiSanti of the Pittsburgh Police. (*Id.*; Docket No. 203 at 5).

Turning to the testimony adduced at the hearings on Defendant's pending amended suppression motion, Agent Vojacek testified that he briefed Detective DiSanti about what he had found after DiSanti arrived on the scene. (Docket No. 203 at 7). Shortly thereafter, numerous Pittsburgh police officers and other parole agents arrived. (*Id.*). Agent Vojacek testified that he did not recall being in the living room area of the apartment when Defendant was read his *Miranda* rights, nor could he recall who was present in the room at that time. (*Id.* at 7, 8, 10, 19). According to Agent Vojacek, six parole agents were at the apartment, four of whom indicated to Vojacek that they did not know whether Defendant was read his *Miranda* rights because they were in and out of the living room area and in other locations during the relevant time period. (*Id.* at 23, 24-26). This information is consistent with Agent Vojacek's email dated February 14, 2019, to Government counsel indicating that he "checked with the Agents present during this incident. No one including myself can recall any Miranda Rights being read while in the residence. The extent of our involvement ended once Pgh PD showed up and Detective DiSanti and crew took over." (Docket No. 201-2; Docket No. 203 at 13).

Detective Lebedda testified that he accompanied Detective DiSanti to Defendant's residence after DiSanti received a phone call from state probation and parole about a possible parole violation. (Docket No. 202 at 6). When the detectives arrived, Defendant and Clausell, who were both handcuffed, were sitting near each other on a couch in the living room area of the apartment. (*Id.* at 8, 16-17). Detective Lebedda unequivocally testified that he was present when

5

Detective DiSanti read Defendant and Clausell their *Miranda* rights from a card that he had given DiSanti.[5] (*Id.* at 8-9, 43-44; Docket No. 200-7). The *Miranda* rights card, which Lebedda carries in his wallet, states the following:

1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.
5. You can decide at any time to exercise these rights and not answer any questions or make any statements.

(Docket Nos. 200-7, 202 at 9). Detective Lebedda further testified that after reading each statement, DiSanti individually asked Defendant and then Clausell if they understood and each responded, "yes." (Docket No. 202 at 11-13, 33-34, 43). Detective Lebedda explained that DiSanti did not move on to the next statement until both Defendant and Clausell responded, and the entire process took approximately five to seven minutes. (*Id.* at 12, 33, 34, 35). Detective Lebedda testified that Defendant seemed to understand the statements and responded to each one. (*Id.* at 12-13). Following that process, Detective Lebedda testified that DiSanti read Defendant and Clausell the search and seizure form, which they executed and thereby gave consent to search the apartment. (*Id.* at 20-21, 35).

According to Detective Lebedda, he and Detectives DiSanti and Novac, as well as three to five parole agents, were present when Defendant and Clausell were given their *Miranda* warnings. (Docket No. 202 at 18, 19, 27-28, 35). Detective Lebedda testified that everyone who was in the room remained while the *Miranda* warnings were administered, but he did not watch to see what everyone was doing. (*Id.* at 35, 44). Detective DiSanti read the *Miranda* warnings

---

5     Detective Lebedda also confirmed in a February 15, 2019, email to Government counsel that he "was present when Detective DiSanti gave the actors their Miranda warnings." (Docket No. 200-3).

loud enough loud enough for Detective Lebedda to hear, so he assumed others could hear as well. (*Id*. at 29).

Detective DiSanti also testified that he administered *Miranda* warnings to Defendant in a normal tone of voice when Defendant was seated on a couch in the living room area of the apartment, which occurred after Detective DiSanti advised Defendant that he was under arrest. (Docket No. 202 at 47, 61, 75). Detective DiSanti recalled that Detective Lebedda was present when he gave Defendant his *Miranda* warnings, and other officers and parole agents were in the vicinity but they came and went. (*Id.* at 54, 61). Detective DiSanti confirmed that he read Defendant his rights using Detective Lebedda's *Miranda* rights card. (*Id.* at 48). Detective DiSanti testified that he read *Miranda* rights to both Defendant and Clausell at the same time and each acknowledged that they understood their rights and that they were willing to waive them. (*Id.* at 49). Detective DiSanti verified that he did not have a *Miranda* rights waiver form available and did not use one in this case. (*Id*. at 50, 63).

Detective DiSanti acknowledged his testimony at the prior suppression hearing held on June 25, 2018, indicating that he did not read Defendant his *Miranda* rights. (Docket No. 111 at 104; Docket No. 202 at 49-50). Detective DiSanti credibly explained that when he previously testified, he thought he was only was being asked to testify about the field contact search and seizure report, which he also had read to Defendant and Clausell.[6] (Docket No. 202 at 49-50,

---

6     DiSanti testified as follows at the suppression hearing held on June 25, 2018:

> Q.     So, other than that brief period for him to sign this consent form, he was always in cuffs and he was always in that room where the couch was, is that right?
> A.     Yes.
> Q.     During that time, I assume there is always at least one if not more officers there overseeing and securing the area, is that correct?
> A.     That's correct.
> Q.     Now, at any time during this process, you didn't read him his Miranda rights, is that right?
> A.     Just read him the form that's on the Field Contact Search and Seizure.

(continued …)

51). Detective DiSanti's explanation is consistent with his clarification of the issue in his February 15, 2019, email to Government counsel:

> I read them their Miranda warnings. I believe the confusion is on my behalf during the questioning of the [prior] suppression hearing. My answer to his so called question was an indication that I was the only officer who read and completed the Search and Seizure Report Form. My answers were only a reflection to the questions regarding the search and seizure procedure. I read the Miranda Warning one time and not again before or during the search and seizure. So what I am getting at is that there was a gap of time between the Miranda Warning and the Search and Seizure signing, since I had to get the form and then administer the information. My mind was on the Search and Seizure process. I don't re-read Miranda Warning prior to the S&S report form.

(Docket No. 200-2 at 1).

Detective DiSanti also testified that he completed a police report concerning Defendant's case. (Docket Nos. 200-6, 202 at 63). According to the report, Defendant admitted when he was interviewed that he attended the gun show to assist Clausell with the purchases so that she paid a fair price for the firearms, he knew it was wrong for him to attend the gun show because he was not permitted to be around firearms, he took full responsibility for the gun and drugs in his apartment, and he knew Clausell was carrying the firearms with her when he accompanied her in her vehicle. (Docket No. 200-6 at 3). Detective DiSanti testified that Defendant made these

---

(Docket No. 111 at 104). In addition to this exchange, the Court reviewed the preceding portion of the transcript leading up to it, which indicates that Detective DiSanti was questioned about the call he received from state parole to assist at the scene, his prior work with Agent Vojacek and whether it involved searches, the observation of a gun in the safe and two firearms in Clausell's purse, and the fact that Defendant's handcuffs were removed when he signed the consent to search form. (*Id.* at 101-104). After reviewing Detective DiSanti's prior testimony in fuller context, the Court finds that DiSanti credibly testified at the recent hearing that he previously thought he was answering questions concerning the field contact search and seizure report. As DiSanti explained in his email to Government counsel, his "answers were only a reflection to the questions regarding the search and seizure procedure. I read the Miranda Warning one time and not again before or during the search and seizure." (Docket No. 200-2 at 1). The Court finds that Detective DiSanti's explanation is credible and supported by the record, including the fact that Defendant's prior suppression motion challenged a warrantless search of his residence. Hence, it was reasonable for DiSanti to believe that he was being asked questions about the search.

statements when he was questioned at the scene in his apartment and not at the police station.[7] (Docket No. 202 at 65-67, 72-73). Detective DiSanti confirmed that he read Defendant his *Miranda* rights **before** he was asked any questions and **before** he made these statements. (*Id.* at 74).

Government counsel stipulated that Detective DiSanti's police report states that he gave Defendant a *Miranda* warning, but the criminal complaint which he completed does not. (Docket No. 202 at 40). Detective DiSanti explained that all the information which is contained in a police report is not necessary for a criminal complaint. (*Id.* at 53). According to Detective Lebedda, "[t]he police report is always more encompassing that the criminal complaint" because the purpose of a police report is to document everything that happened, whereas the purpose of a criminal complaint is to establish that an individual committed a crime and to show there was probable cause to arrest him for that crime. (*Id.* at 44-45).

### III. Amended Motion to Suppress Evidence

A defendant who "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings are required because custodial interrogation involves "inherently compelling pressures." *Id.* at 467. When the police fail to give adequate *Miranda* warnings, or fail to give any *Miranda* warnings whatsoever, any statement made by an individual who is subject to custodial interrogation is inadmissible at trial. *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980).

Here, Defendant argues that any statements he made to law enforcement at the scene or

---

[7] The parties stipulated that ATF Agent Carman would have testified that Defendant did not make any statements to him at the Pittsburgh police station. (Docket No. 203 at 29).

9

at the police station[8] should be suppressed because he was in custody at the time, but he had not been given any *Miranda* warnings. (Docket No. 192, ¶¶ 12, 17). Defendant contends that the testimony of Detectives Lebedda and DiSanti regarding the events of March 17, 2016, is inconsistent and contradictory, thus the Government has failed to establish by a preponderance of the evidence that Detective DiSanti administered *Miranda* warnings to Defendant. (Docket No. 207, ¶¶ 44, 45, 47).

The Government responds that both Lebedda's and DiSanti's testimony was clear and indisputably established that Defendant was read his *Miranda* rights and waived them prior to any questioning. (Docket No. 204, ¶ 7). According to the Government, the fact that Agent Vojacek and his fellow agents were not present the entire time and did not witness the *Miranda* reading and waiver is not dispositive of the matter. (*Id.*). As Defendant received *Miranda* warnings and waived his rights before making any statements, the Government submits that his amended motion to suppress should be denied. (*Id.* ¶ 8). The Court agrees.

### A. Applicable Law

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion . . . the burden shifts to the government." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). "A defendant 'satisfies that burden if he alleges that he was subjected to custodial questioning without the benefit of *Miranda* warnings,' at which point the government must 'prove by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or ... [the defendant] ... was properly *Mirandized* and waived his rights.'" *United States v. Valenta*, Crim. No. 15-161, 2017 WL

---

8    *See supra*, n.7.

2131375, at *4 (W.D. Pa. May 17, 2017) (quoting *United States v. Tudoran*, 476 F. Supp. 2d 205, 216 (N.D.N.Y. 2007) (citation omitted)). As stated, Defendant seeks to suppress any statements he made when he was subjected to custodial interrogation because he did not receive *Miranda* warnings. The Government does not dispute that Defendant was placed under arrest and therefore was in custody.[9] Accordingly, the Government has the burden of establishing by a preponderance of the evidence that Defendant was properly *Mirandized* and waived his rights.

To determine whether a *Miranda* waiver is valid, the government must establish that: "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (citation omitted). The government has "the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver." *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986)).

### B. There Was No Miranda Violation in This Case.

The Government has met its burden to prove by a preponderance of the evidence that Defendant was given *Miranda* warnings and waived his *Miranda* rights. Both Detectives Lebedda and DiSanti credibly testified that DiSanti administered *Miranda* warnings after Defendant was arrested while he was seated on a couch in the living room area of the apartment

---

[9] A person is in custody for *Miranda* purposes when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)). Here, Detective DiSanti testified that he placed Defendant under arrest, (Docket No. 202 at 75), thus he was in custody for *Miranda* purposes.

11

and prior to any questioning by law enforcement. (Docket No. 202 at 8-9, 11-13, 33-34, 43-44, 47, 48, 49, 61, 74, 75). Detective DiSanti read Defendant his rights from a *Miranda* rights card furnished by Detective Lebedda. (*Id.* at 8-9, 43-44, 48). Detective DiSanti read each statement advising Defendant of his rights and inquired whether he understood same, and Defendant answered "yes." (*Id.* at 11-13, 33-34, 43, 49). After acknowledging that he understood his rights, Defendant indicated that he was willing to waive them. (*Id.* at 49).

The Court is not persuaded by Defendant's argument that the Government failed to establish that Defendant was given *Miranda* warnings because the testimony of Detectives Lebedda and DiSanti was contradictory or inconsistent for a variety of reasons. First, contrary to Defendant's position that Detective DiSanti's prior testimony establishes that he did not read Defendant his *Miranda* rights, (*see* Docket No. 207, ¶ 43), the Court finds credible DiSanti's explanation that he previously thought he was testifying only about the field contact search and seizure report. (*See supra* n.6). As DiSanti explained in his email to Government counsel, his "answers were only a reflection to the questions regarding the search and seizure procedure. I read the Miranda Warning one time and not again before or during the search and seizure." (Docket No. 200-2 at 1).

Next, although the testimony differed somewhat as to who and how many police officers and/or parole agents were present when Detective DiSanti administered Defendant's *Miranda* rights, and whether the individuals stayed in the room or came and went, the Court does not find those matters dispositive.[10] Both Lebedda and DiSanti were consistent in their recollection and

---

10   Likewise, Agent Vojacek's testimony that he did not recall being in the living room area of the apartment when Defendant was read his *Miranda* rights, (*see* Docket No. 203 at 7, 10, 19), does not establish that Defendant was not given *Miranda* warnings. Agent Vojacek did not testify that Defendant was not given *Miranda* warnings; rather, he testified that he and other parole agents who were at the scene did not know one way or the other. (*Id.* at 24, 27).

testimony that a number of other law enforcement officers were present and/or were in the vicinity of the living room area when Defendant was read his *Miranda* rights.

Further, Detective DiSanti's testimony that he read Defendant his *Miranda* rights is not contradicted by the fact that his police report included that information, but the state criminal complaint did not.[11] Detective DiSanti explained that all information which is contained in a police report is not necessary for a criminal complaint. (Docket No. 202 at 53). As Detective Lebedda further explained, this is because the purpose of a police report is to document everything that happened, whereas the purpose of a criminal complaint is to establish that an individual committed a crime and to show there was probable cause for an arrest. (*Id.* at 44-45).

Finally, Defendant asserts that the chronology of the police report suggests that Defendant made the listed statements at the police station, not at his apartment, which is contrary to Detective DiSanti's testimony indicating that Defendant made the statements in question at the apartment. (Docket No. 207, ¶¶ 19, 20). The Court has reviewed the police report, as well as Detective DiSanti's testimony on this point. The paragraphs preceding the one describing Defendant's statements appear to be in chronological order as they discuss information Detective DiSanti received from Agent Vojacek, what occurred after DiSanti arrived at Defendant's apartment, including administration of *Miranda* rights and execution of the consent to search form, a description of items recovered during the search, and Defendant's and Clausell's transport to the police station for interviews. (Docket No. 200-6 at 2-3). The next paragraph lists Defendant's statements admitting that he attended the gun show and that he knew it was wrong

---

11 Defendant also critiques Detective DiSanti's failure to state in his police report or the criminal complaint that he used a *Miranda* rights card, and that he and Detective Lebedda failed to mention same in response to Government counsel's emails. (Docket No. 207, ¶¶ 25, 26). In this Court's estimation, the fact that this level of detail was not included in those documents is not dispositive of the issue whether Defendant received *Miranda* warnings.

for him do to so, that he took full responsibility for the gun and drugs in his apartment and that he knew Clausell was carrying firearms with her when he accompanied her in her vehicle. (*Id.* at 3). That same paragraph indicates that Defendant is a former felon, which prohibits him from possessing a firearm, and references a prior arrest number. (*Id.*). The next and final paragraph of the police report lists Defendant's residence, describes several items contained therein, notes that Defendant and Clausell possessed a large amount of packaged heroin along with firearms and ballistic vests and states that Clausell was unable to produce a license to carry a concealed firearm. (*Id.* at 3-4).

Detective DiSanti testified that the police report is generally in chronological order, but the paragraph concerning Defendant's statements was added at the end. (Docket No. 202 at 66). Defense counsel suggested on cross-examination that the report indicated Defendant made the statements at the police station, but Detective DiSanti testified that was not the case and confirmed Defendant made them at the apartment.[12] (*Id.*). Although the police report could have been more succinctly drafted, the Court recognizes that police officers are not lawyers and

---

12     Detective DiSanti testified as follows on this point:

> Q.     This police report is written, I believe, in chronological order, in other words, paragraph that follows each paragraph before it occurred later in time?
> A.     Generally speaking, yes.
> Q.     Wouldn't it be true that you transferred Pride and Clausell to Zone 5 station for interviews, and then the next paragraph you describe in the interview with Pride, he made certain statements?
> A.     Yes.
> Q.     **And that would then indicate that these statements were made not in the apartment but at the police station, right?**
> A.     **Your interpretation, but he made those statements at the apartment.** I just incorporated into my report when I show – also showing the indication of his being a former felon to not possess a firearm. That's information I don't know exactly at that time that I gather that exact information by getting the date and the OTN number for his arrest. Those are situations where I might add that in later.
> Q.     **Okay. So your testimony is that the last full paragraph on the bottom of page 3 were statements made by Mr. Pride at the apartment?**
> A.     **Yes.**

(Docket No. 202 at 66-67) (emphasis added).

their reports should not be judged by the same standard as legal briefs. Accordingly, the Court finds credible Detective DiSanti's testimony that Defendant made the statements referenced in the police report when he was questioned at the scene in his apartment, and not at the police station. (Docket Nos. 200-6 at 3; 202 at 65-67, 72-73).

In sum, the Court is not persuaded by Defendant's arguments attempting to establish that the testimony of Detectives Lebedda and DiSanti was inconsistent and contradictory. The Court finds that both detectives credibly testified that Defendant was given *Miranda* warnings and he voluntarily waived his rights and made statements to law enforcement. *See United States v. Conley*, 859 F. Supp. 830, 840 (W.D. Pa. 1994) ("The Court, as finder of fact, is free to accept or reject any part or all of any witness's testimony."). Defendant does not otherwise contend that his *Miranda* waiver was invalid, nor does he claim that his statements were coerced or involuntary.[13] Accordingly, the statements Defendant made in response to questioning by the law enforcement officers are admissible at the trial of this case.

## IV. Conclusion

For the reasons discussed herein, Defendant's Amended Motion to Suppress Evidence (Docket No. 192) is DENIED.

An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

Date: July 3, 2019

cc/ecf: All counsel of record

---

13    Statements not obtained in violation of a person's *Miranda* rights are nonetheless subject to suppression as violative of due process if the statements are coerced or involuntary. *Arizona v. Fulminante*, 499 U.S. 279, 288–91 (1991). A statement is coerced or involuntary if the behavior of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961). As noted, Defendant does not contend that any statements he made to law enforcement were coerced or involuntary and nothing in the record before the Court suggests that was the case.